IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM T. JEFFREY, JR. | : |
| | :    CIVIL ACTION |
| v. | : |
| | :    NO. 17-0531 |
| THOMAS JEFFERSON UNIVERSITY | : |
| HOSPITALS, INC., | : |
| *t/d/b/a THOMAS JEFFERSON UNIVERSITY* | : |
| *HOSPITAL* | : |

## **MEMORANDUM**

**SURRICK, J.**                                                                                    **MAY 14, 2019**

Presently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 23.)
For the following reasons, Defendant's Motion will be granted.

## I.      **INTRODUCTION**

This employment discrimination case arises as a result of Plaintiff William Jeffrey, Jr.'s

allegations that his employer, Defendant Thomas Jefferson University Hospitals, Inc. terminated

his employment as an Interventional Radiology nurse based on age, gender, and disability.

Plaintiff's Complaint alleges that Defendant terminated him in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000(e) *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. & Cons.

Stat. Ann. § 951 *et seq.* (Compl., ECF No. 1.) Defendant contends that Plaintiff was terminated

for a legitimate, nondiscriminatory reason—specifically, because he handed the incorrect

medication to a surgical technician, who injected the medication into a patient, resulting in an

emergency. Because Plaintiff had a significant and consistent history of misconduct and poor

performance that culminated in this emergency incident, there is no genuine dispute of material fact with regard to whether discrimination was a motivating or determinative factor in Plaintiff's termination. Accordingly, Defendant is entitled to summary judgment.

## II.    BACKGROUND

### A.    Factual Background[1]

Plaintiff is a male nurse who was employed by Defendant beginning in 1985. (Pl.'s Dep. 25-26, MSJ Ex. 1.) In 1993, Plaintiff was transferred to the Interventional Radiology Unit. (*Id.* at 26.) In 2006, Plaintiff was diagnosed with bipolar disorder, for which he takes medication and seeks psychiatric treatment. (*Id.* at 38, 216, 232.) Plaintiff notified Defendant of the bipolar disorder diagnosis in September of 2006 when he requested leave to accommodate the illness. (Cert. of Physician, Pl.'s Resp. Ex. V, ECF No. 25.) Defendant accommodated Plaintiff's disorder with work schedule adjustments when necessary. (Pl.'s Dep. 216.)

Between 2002 and 2015, Plaintiff's coworkers and supervisors recorded a number of incidents regarding Plaintiff's behavior, some of which included verbal or written warnings, or resulted in Plaintiff being removed from certain job responsibilities. (Pl.'s Dep. 61-120; Series of Events, MSJ Ex. 4.) For example, Plaintiff's personnel file contains a number of incidents memorialized in "Discussion Sheets." (Series of Events.) These Discussion Sheets describe incidents such as insubordination in refusing to work on a certain date, selling raffle tickets while

---

[1] Unless otherwise indicated, the factual background is undisputed and is derived from a combination of Defendant's Statement of Uncontested Material Facts ("SOF") (ECF No. 23-2), Plaintiff's Counter-Statement of Uncontested Material Facts ("Counter-SOF") (ECF No. 25-1), Plaintiff's Response to Defendant's SOF ("Pl.'s Resp. to SOF") (ECF No. 25-1), and Defendant's Response to Plaintiff's Counter-SOF ("Defs.' Resp. to Counter-SOF") (ECF No. 26-1). We view the facts and reasonable inferences therefrom in the light most favorable to Plaintiff as the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

2

at work, and documentation errors. (Pl.'s Dep. 61-66, 95-96.) They also include at least six incidents of inappropriate interactions with patients, coworkers, or others, such as having a poor attitude toward patients, yelling at a family member in front of patients, making jokes during a serious procedure, making race-related comments, and using an angry tone with coworkers. (*Id.* at 74-75, 79-80, 85-86, 89-90, 97-99.) A number of these incidents resulted in more serious consequences such as verbal and written warnings and "Coaching Records" in which Plaintiff agreed to change his behavior. (*Id.*; Series of Events.)

The majority of the incidents regarding inappropriate interactions, and those resulting in more serious consequences, occurred after Plaintiff's diagnosis of bipolar disorder. (*Id.*) Also after Plaintiff's diagnosis, in separate instances, he was taken off a call schedule and asked to take a leave of absence when coworkers and supervisors expressed concern about Plaintiff's emotions and ability to perform his work. (Pl.'s Dep. 94, 103-05.) Specifically, in 2010, one of Plaintiff's supervisors, Edward Cullen, who had been supervising Plaintiff since November of 2009, detailed for a supervising doctor Plaintiff's history of poor interpersonal behaviors, including "alternat[ing] abruptly and often between laughing and crying," exhibiting "nervous and anxious behaviors," and having conversations that were "confused and loud." (Letter to Dr. O'Connor, Pl.'s Resp. Ex. Q; Cullen Dep. 7, Pl.'s Resp. Ex. N.) During this time, Plaintiff called one nurse "Little Hitler," and his behavior caused distress to a patient's family and caused Plaintiff to assess a patient improperly. (Letter to Dr. O'Connor; Pl.'s Dep. 102-03.) These issues were so concerning to Cullen that he called Plaintiff's wife to take him home "to ensure his safety," noted that Plaintiff was out on leave, and "hope[d] he will use this time to get the necessary help he needs." (Letter to Dr. O'Connor.) Plaintiff maintains that at least some of these incidents were inappropriate and caused by his bipolar disorder. (Pl.'s Dep. 103-05.)

3

Nevertheless, in August of 2014, Plaintiff's supervisors completed an annual review of Plaintiff's performance and checked the box indicating that his overall performance "consistently meets the expectation." (2013-14 Perf. Eval., Pl.'s Resp. Ex. X.)

In January of 2015, Plaintiff took a three-month medical leave of absence for a fractured ankle sustained outside of work. (Pl.'s Dep. 111.) Plaintiff testified at his deposition that he was unable to maintain proper medication levels for his bipolar disorder during this time. (*Id.* at 112-118.) After his return to work in April of 2015, Plaintiff felt that his medication levels had not yet stabilized, and he believes that he made this known to his supervisors. (*Id.* at 112.) However, only one of Plaintiff's supervisors testified that he was aware that Plaintiff had mental health issues. (Sesto Dep. 19, Pl.'s Resp. Ex. S; *see also* Powell Dep. 17, Pl.'s Resp. Ex. G; Cullen Dep. 32 (stating that Plaintiff never disclosed mental health issues to them).) This supervisor had been aware of these issues "over the years," thought the issues could be affecting Plaintiff's work performance, had allegedly spoken to Cullen about her concerns, and, when Plaintiff took leaves of absence from work, she understood these to be for mental health reasons. (Sesto Dep. 20, 23-24, 57.) In late May of 2015, Plaintiff's supervisors met with Plaintiff to discuss complaints that he was acting "unsure and labored" and "awkward," "need[ed] constant direction," and "[wa]s not functioning at a level that he is safe to do complex and or safely support procedures on-call." (Outline of Discussion, MSJ Ex. 8.) The supervisors also noted that he had recently returned from a three-month medical leave. (*Id.*) Plaintiff agreed with this assessment and agreed to work on only minor procedures thereafter. (Pl.'s Dep. 119-120.) One of Plaintiff's supervisors also noted during this time that Plaintiff was not a "good fit" in the department, had not been performing up to standard "for a long time," even before his ankle

4

injury, and "could not make quick decisions. . . . [t]hat related to critical patient care." (Sesto Dep. 14-17.)

In August of 2015, Plaintiff's supervisors completed Plaintiff's annual review and checked the box indicating that his overall performance presented an "Opportunity for Improvement." *(See generally* Perf. Eval., MSJ Ex. 9.) In preparing this report, Cullen noted that every physician in Plaintiff's unit had complained about Plaintiff's performance. (Cullen Dep. 16-17.) The report contained comments that Plaintiff had "difficulty handling more than one task at a time," "demonstrated a lack in basic job skills," "ha[d] difficulty handling stressful clinical situations and needs significant guidance," "appear[ed] overwhelmed," and "[did] not instill confidence in the physician staff." (Perf. Eval. 4, 5.) Plaintiff commented at the end of the review that he felt his evaluation was "unfair." *(Id.* at 14.) He further explained that his medication levels were unstable upon returning from leave and that he had "a 2 week period of feeling manic" but that his symptoms "improved with higher blood levels" and "[his] doctor feels [he is] stable." *(Id.)* As a result of the annual review, Plaintiff was put on a "Performance Improvement Plan." (Powell Dep. 16; Perf. Improv. Plan, MSJ Ex. 11.) Plaintiff stated that he understood the Plan. (Pl.'s Dep. 199.)

On October 9, 2015, while on the Plan, Plaintiff was assigned to a non-complex task that he had the capability to perform. That task was to retrieve the correct medication from Defendant's medication-dispensing system and hand it to a surgical technician, Jemma Reinhardt, who would inject the medication into the patient's catheter. (Pl.'s Dep. 149-150.) Unfortunately, Plaintiff retrieved the wrong medication. *(Id.* at 145; Pl.'s Statement re Incident, MSJ Ex. 13.) When Reinhardt injected the medication into the patient's catheter, the patient lost consciousness. *(Id.)* Reinhardt yelled for help. (Reinhardt Dep. 16, MSJ Ex. 14.) Plaintiff was

5

"stunned" into inaction and "didn't know what to do." (Pl.'s Dep. 154.) A doctor ran into the room and revived the patient. (Shaw Dep. 9-10, MSJ Ex. 15.) Plaintiff told Reinhardt in a text message sent later that day that "[he] take[s] full responsibility for getting the wrong drug out." (Reinhardt Dep. 24; Pl.'s Dep. 178-181.) Plaintiff also admits that he "felt so embarrassed and so upset with [him]self." (Pl.'s Dep. 200.) Plaintiff and Reinhardt were both suspended from employment pending an investigation of the incident. (Pl.'s Dep 176, 180; Reinhardt Dep. 24.)

Dr. Shrenik Shah was involved with the patient's case, and ordered Reinhardt to inject the patient, but was not in the room during this incident. (Reinhardt's Statement re Incident, MSJ Ex. 15; Pl.'s Statement re Incident, MSJ Ex. 13.) Dr. Shah is supervised by medical staff and is subject to Defendant's "Medical Staff Bylaws and Hospital rules." (Shah House Staff Agreement, MSJ Ex. 18.) The parties dispute whether Dr. Shah is subject to different standards than nurses, or merely additional standards. (Def.'s SOF ¶ 66; Pl.'s Resp. to Pl.'s SOF ¶ 73.) A human resources representative employed by Defendant in 2015 testified that "patient safety" is a "universal standard" for all medical staff, including physicians, despite their differing roles with regard to the patient. (Powell Dep. 9, 45.)

On October 20, 2015, Plaintiff was terminated from employment "for failure to follow safe medication practices and failure to provide continuous care for a patient in distress" during the incident on October 9th. (Termination Letter, MSJ Ex. 23.) Plaintiff's supervisor stated at his deposition that, aside from Plaintiff, he was not aware of any other employee of Defendant in the Interventional Radiology Unit from 2010-2015 who had made a similar medication error. (Blob Dep. 11-12, MSJ Ex. 28.) Plaintiff's supervisor stated that Plaintiff's mental illness was not a factor in determining Plaintiff's termination. (Cullen Dep. 31.) Plaintiff was 55 years old at the time of his termination. (Compl. ¶ 20.)

6

Reinhardt was given a "Suspension/*Final* Warning," for the incident even though, prior to this incident, Reinhardt had never been subject to discipline while employed with Defendant. (Reinhardt Dep. 29 (emphasis added).) Reinhardt's supervisor testified that he disagreed with Reinhardt's suspension because she was a good employee who had never been disciplined before and who was merely acting as Dr. Shah had instructed. (Calvo Dep. 11, 21-22, Pl.'s Resp. Ex. T.)

There is no evidence that Dr. Shah was disciplined for the incident. However, Cullen stated that he did have a verbal discussion with Dr. Shah regarding the incident. (Cullen Dep. 25.) There is no record of that discussion.

On October 22, 2015, Plaintiff filed a grievance with Defendant. (Pl.'s Grievance, MSJ Ex. 24) He also presented his case to a representative from Defendant's Human Resources Department. (Pl.'s Dep. 220-21, 223-24; Grievance Answer, MSJ Ex. 27.) In his grievance, Plaintiff stated that "I feel that I am a victim of discrimination because of my mental illness." (Pl.'s Grievance 3.) On November 19, 2015, Plaintiff's request to overturn his termination was denied because there was "insufficient evidence" to support Plaintiff's position. (Grievance Answer.)

After Plaintiff was terminated, Defendant hired four female nurses, all of whom were between the ages of 29 and 30. (Sesto Dep. 70-74.)

## B. Procedural History

On or about January 6, 2016, Plaintiff filed a written charge of discrimination against Defendant with the Equal Opportunity Employment Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"). (Compl. ¶ 16.) On February 6, 2017, Plaintiff filed a Complaint in this Court, alleging age discrimination under the ADEA (Count I);

reverse gender discrimination under Title VII (Count II); disability discrimination and retaliation under the ADA (Count III); and age, gender, and disability discrimination, as well as retaliation, under the PHRA (Count IV). Defendant filed an Answer on April 10, 2017. (ECF No. 8.) Defendant filed the instant Motion on November 7, 2017. Plaintiff filed a Response in Opposition to the Motion on December 21, 2017. (Pl.'s Resp.) Defendant filed a Reply on January 8, 2018. (ECF No. 26.) On April 12, 2019, Plaintiff withdrew all the retaliation claims. (ECF No. 28.)

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone,* 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir.

8

2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## IV. DISCUSSION

"[T]he ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995). In a case such as this, where the plaintiff has offered no direct evidence of discrimination, we apply the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Simpson v. Kay Jewelers*, 142 F.3d 639, 643-44 (3d Cir. 1998). Under this framework, the initial burden of establishing a *prima facie* case rests with the plaintiff. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *Id.* If the defendant articulates such a reason, the burden shifts back to the plaintiff, who must then show by a preponderance of the evidence that the employer's proffered reason is pretextual. *Id.* at 804.

Throughout this analysis, we must keep in mind that "it is not for this Court to 'sit as a

super-personnel department that reexamines an entity's business decisions.'" *Carfagno v. SCP Distrib., LLC*, No. 14-4856, 2016 WL 521196, at \*5 (E.D. Pa. Feb. 10, 2016) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)). "Instead, this Court must determine 'whether the employer gave an honest explanation of its behavior' that is not discriminatory." *Id.* (quoting *Brewer*, 72 F.3d at 332.)

## A. Age Discrimination Under the ADEA and PHRA

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[2] 29 U.S.C. § 623(a)(1). Plaintiff contends that Defendant discriminated against him on the basis of age because, after he was terminated, Defendant hired four nurses aged 29-30—each at least 15 years his junior.

### 1. *Plaintiff's* Prima Facie *Case*

To establish a prima facie case of age discrimination, the plaintiff must show: (1) that the plaintiff was forty years of age or older; (2) that the defendant took an adverse employment

---

[2] The PHRA also prohibits age discrimination. It provides:

It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. & Cons. Stat. Ann. § 955(a). Because the same analysis applies to claims under the ADEA and the analogous provision of the PHRA, we address Plaintiff's claims collectively. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

action against the plaintiff; (3) that the plaintiff was qualified for the position in question; and (4) that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith*, 589 F.3d at 689-90 (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)). Plaintiff's burden at the *prima facie* case stage is "not onerous." *Simpson*, 142 F.3d at 646 (citations omitted).

Here, Defendant concedes for the purpose of this Motion that Plaintiff has satisfied the first three prongs of his *prima facie* case. Defendant contests only that Plaintiff was replaced by an employee who was sufficiently younger to support an inference of discriminatory animus. However, Plaintiff's burden at this stage is low and may be satisfied by presenting facts sufficient to show that Plaintiff was in fact replaced with a sufficiently younger employee. *Edgerton v. Wilkes-Barre Home Care Servs., LLC*, 600 F. App'x 856, 858 (3d Cir. 2015) (stating that inference of age discrimination "usually established through an employer's hiring of a sufficiently younger replacement" (citing *Potence*, 357 F.3d at 370; *Torre v. Casio, Inc.*, 42 F.3d 825, 830-31 (3d Cir. 1994))). Here, Plaintiff has demonstrated that, after he was fired, his supervisors hired four new nurses aged 29 to 30. Those nurses are at least 15 years younger than Plaintiff. This is a sufficient age difference to raise an inference of discriminatory animus. *See id.* (holding that 12 years is "a gap sufficient in size to infer discrimination" (citation omitted)). Plaintiff has established a *prima facie* case.

## 2. *Legitimate, Nondiscriminatory Reason for Termination*

The burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its action. Under the *McDonnell Douglas* framework, the employer satisfies its "relatively light" burden of production by introducing evidence which, taken as true, would permit a conclusion that there was a nondiscriminatory reason for its employment decision. *Fuentes v.*

11

*Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer need not prove that the proffered reason actually motivated the termination decision, because "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Defendant has satisfied its burden. Defendant's proffered reason for terminating Plaintiff was that Plaintiff committed a very serious patient safety violation. *See, e.g.*, *DeCicco v. Mid-Atlantic Healthcare, LLC*, 275 F. Supp. 3d 546, 555-56 (E.D. Pa. 2017) (noting that violation of internal company policies may constitute legitimate, nondiscriminatory reason for termination); *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *6 (E.D. Pa. Oct. 7, 2016) ("Violating [employer company] policy is undoubtedly a legitimate and nondiscriminatory reason for termination."). In a hospital setting, where patient safety is a "universal standard," it is perfectly legitimate for a nurse to be fired for endangering the life of a patient as Plaintiff did here.

### 3. Pretext

At the final stage of the analysis, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis*, 808 F.3d at 644. To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either: "1) disbelieve or discredit the employer's justification; or 2) believe discrimination was more likely than not a 'but for' cause of the adverse employment action." *Abels v. Dish Network Serv., LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Fuentes*, 32 F.3d at 764). "Age discrimination may be established by direct or indirect evidence."[3] *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167

---

[3] "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] *without inference or presumption*." *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (internal citations and quotations omitted).

(3d Cir. 2001) (citing *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998)).

To establish pretext under the first prong, the plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Instead, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find [it] 'unworthy of credence.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Under the second prong, a plaintiff may establish pretext by presenting evidence with sufficient probative force so as to allow the factfinder to conclude by a preponderance of the evidence that age was a "but for" cause of the termination. *Abels*, 507 F. App'x at 183 (citing *Fuentes*, 32 F.3d at 764). This proof may consist of evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." *Willis*, 808 F.3d at 645.

Regardless of the method by which pretext is proven in age discrimination cases, it is not sufficient to simply show that age was "a motivating factor" in the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-77 (2009). Rather, a plaintiff must demonstrate that age was a determinative factor or "the 'but-for' cause of the employer's adverse decision." *Id.*; *see also Smith*, 589 F.3d at 690-91 (explaining that, following *Gross*, an ADEA plaintiff must prove that age was the "but for" cause of the employer's adverse employment action).

13

Plaintiff here can neither discredit Defendant's proffered reason nor show that discrimination was the "but for" cause of his termination. Plaintiff cannot discredit Defendant's proffered reason for his termination because Plaintiff himself admitted the seriousness of the October 9th incident and immediately accepted full responsibility for it. *See, e.g., Ferrell v. Harvard Indus.*, No. 00-2707, 2001 U.S. Dist. LEXIS 17358, at *50 (E.D. Pa. Oct. 23, 2001) (holding that plaintiff failed to discredit employer's reasons for termination because plaintiff admitted misconduct); *Wilson v. U.S. Air Express*, No. 98-1190, 1999 U.S. Dist. LEXIS 14250, at *16 (E.D. Pa. Sep. 15, 1999) (holding that plaintiff failed to discredit employer's reasons for termination because plaintiff herself "admitted that she failed to meet defendant's expectations regarding attendance, performance and behavior"). That Plaintiff's actions merited punishment is undisputed.

Plaintiff also cannot present facts from which a jury could infer that discrimination was more likely than not the "but for" cause of his termination. Plaintiff argues that Reinhardt and Dr. Shah, who are both younger than Plaintiff, are similarly situated to Plaintiff as to their involvement in the October 9, 2015 incident. Plaintiff argues that they were not disciplined as harshly—or at all, in Dr. Shah's case. With regard to discipline in the workplace, the relevant factors to consider in determining whether individuals are "similarly situated" may include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McCullers v. Napolitano*, 427 Fed. App'x. 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

Although some factors indicate that Plaintiff is similarly situated to Reinhardt and Dr.

14

Shah, there are differentiating circumstances that render them not similarly situated. With regard to Reinhardt, the record shows that Plaintiff and Reinhardt are subject to discipline by the same supervisor, subject to the same or similar workplace standards, and engaged in similar misconduct related to the October 9, 2015 incident. There is also some dispute about whether Reinhardt was acting beyond the scope of her duties as a surgical technician when she injected the patient outside the presence of a doctor, and whether she and Plaintiff had the same responsibilities with regard to administering correct medications. (Calvo Dep. 12, Pl.'s Resp. Ex. T (stating that Reinhardt was not necessarily acting outside the scope of her duties); Reinhardt Dep. 31 (admitting that she was disciplined for administering medication outside scope of practice, but adding that that "was fairly common").) Plaintiff argues that Reinhardt was acting outside the scope of her duties and was equally responsible as Plaintiff was for injecting the correct medication. Therefore, Plaintiff argues, Reinhardt is just as culpable as Plaintiff and should have been punished in the same way. (Pl.'s Resp. 8.) However, Reinhardt has no disciplinary history at all. Moreover, she reacted to the patient's distress appropriately. Even assuming that Reinhardt and Plaintiff were equally culpable, they are not similarly situated. Moreover, Reinhardt *was* severely disciplined for her role in the October 9, 2015 incident—she was issued a "Suspension/Final Warning" even though it was her first infraction. These factors are sufficient to distinguish Reinhardt's situation from Plaintiff's.

Dr. Shah is also not similarly situated to Plaintiff because: (1) Plaintiff's involvement in the October 9th incident is different than Dr. Shah's involvement, and (2) they are subject to discipline by different supervisors. We note that Plaintiff was unable to depose Dr. Shah during discovery, so there is a dearth of evidence regarding Dr. Shah's involvement, responsibilities, culpability, and punishment. Moreover, although the parties dispute whether Plaintiff and Dr.

Shah are subject to the same workplace standards, it is clear that ensuring patient safety is a standard that is applicable to all healthcare employees. However, even assuming that Plaintiff and Dr. Shah were subject to the same standard, this would not affect our conclusion. Dr. Shah was not a direct cause of the harm to the patient. Rather, it was *Plaintiff* who directly caused the patient's distress and failed to react to that distress. In addition, Plaintiff's supervisors had no authority to discipline Dr. Shah. Therefore, Dr. Shah is not an appropriate comparator.

Plaintiff also argues that one of Plaintiff's supervisors made potentially ageist or sexist remarks about him when she stated that Plaintiff, who is one of the older nurses at the hospital, was not "a good fit" and "could not make quick decisions." (Sesto Dep. 14-17.) There is nothing overtly sexist or ageist about these remarks. Moreover, they do not raise an inference of discrimination when they are put in their proper context. Plaintiff's supervisor made these statements after Plaintiff returned from his ankle surgery, when his medication levels were admittedly unstable and every doctor in Plaintiff's unit had complained about his poor work performance.

After a thorough review of the record, we are satisfied that there is no genuine issue of material fact as to Plaintiff's age discrimination claim. We will therefore grant Defendant's request for summary judgment on that claim.

**B.    Reverse Gender Discrimination Under Title VII and the PHRA**

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] . . . sex . . . ." 42

16

U.S.C. § 2000e-2(a)(1).[4] As with claims pursuant to the ADEA, Title VII discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting paradigm. *See McDonnell Douglas Corp.*, 411 U.S. at 802. To establish a *prima facie* case of gender discrimination, Plaintiff must show that (1) he belongs to a protected class, (2) he is qualified for the position, and that (3) Defendant subjected him to an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See id.* If Plaintiff succeeds in establishing the foregoing, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for Plaintiff's termination. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If Defendant meets this burden, Plaintiff must establish by a preponderance of the evidence that Defendant's proffered reasons are a pretext for discrimination. *See id.*

As with the age discrimination claim, Defendant concedes for the purpose of this Motion that Plaintiff has satisfied the first three prongs of his *prima facie* case, but contends that Plaintiff was not terminated in such a way that raises an inference of discrimination. As with the ADEA, "[c]ommon circumstances giving rise to an inference of unlawful discrimination [pursuant to Title VII] include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock v. Children's Hosp.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). Plaintiff has shown that, after he was terminated, his supervisors hired four female nurses. Therefore, he has made a *prima facie* case.

---

[4] Because the same analysis applies to claims under Title VII and the analogous provision of the PHRA, we address Plaintiff's claims collectively. *See Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996))).

17

Next, as discussed above, Defendant's proffered reason for terminating Plaintiff is legitimate and non-discriminatory: Plaintiff's involvement in the October 9th incident, his failure to react to the patient's distress, and his consistent disciplinary history.

Plaintiff must show that Defendant's proffered reason is a pretext for gender discrimination. A plaintiff may show pretext under Title VII by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.[5] For the second prong, similar to the second prong in claiming pretext in an ADEA claim, a plaintiff can use comparators to show that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010).

As stated above, Plaintiff has failed to offer any evidence discrediting Defendant's proffered reason for terminating him and, to the contrary, Plaintiff has admitted to his culpability in the October 9th incident. Nevertheless, Plaintiff argues that there is sufficient evidence from which a jury could infer that gender discrimination was more likely than not a motivating or determinative factor because Reinhardt, a woman, was not punished as severely as Plaintiff. However, we have determined that Reinhardt is not an appropriate comparator because she has

---

[5] We note that the second prong in a Title VII case is slightly different than the analogous prong in an ADEA case because, in an ADEA case, as stated above, the plaintiff must show that an invidious discriminatory reason was more likely than not a *determinative*, or "but-for," cause of the employer's action. *Gross*, 557 U.S. at 176-77. In a Title VII case, a plaintiff can survive summary judgment even if discrimination was only a *motivating* factor in the defendant's decision, rather than a determinative factor. *Fuentes*, 32 F.3d at 764. The difference is immaterial here because, as explained below, Plaintiff is unable to show that discrimination was either a motivating or determinative factor in Defendant's decision to terminate him.

18

no disciplinary history, did not fail to react to the patient's distress during the October 9th incident, and was in fact disciplined harshly for the incident. Plaintiff offers no other evidence to satisfy his burden. Therefore, as with the ADEA claim, there is no genuine dispute of material fact with regard to Plaintiff's gender discrimination claims and Defendant's request for summary judgment will be granted.

## C. Disability Discrimination and Retaliation Under the ADA and the PHRA

### 1. Disability Discrimination

The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[6] As with the ADEA and Title VII claims, courts apply the burden-shifting paradigm set forth in *McDonnell Douglas* to analyze disability discrimination claims under the ADA. *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422,

---

[6] The analogous provision of the PHRA states:

> It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . disability . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. & Cons. Stat. Ann. § 955(a). Although the ADA, as amended, and the PHRA define "disability" differently, all other elements of the claims under each statute are analyzed in the same manner. *Blassingame v. Sovereign Sec., LLC*, No. 17-1351, 2017 U.S. Dist. LEXIS 123980, at *23 n.5 (E.D. Pa. Aug. 7, 2017) ("[W]hile the disability standards are different, the remaining elements of an ADA and PHRA claim are essentially the same and can be analyzed together." (citing *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014)). Because Defendant concedes for the purpose of this Motion that Plaintiff has a disability as defined in both the ADA and PHRA, we address Plaintiff's claims collectively.

19

434 (E.D. Pa. 2015) (applying *McDonnell-Douglas* to disability discrimination claim under ADA). To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must demonstrate: (1) that he is a disabled person within the meaning of the ADA; (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that he has suffered an adverse employment action that was the result of discrimination. *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Once Plaintiff presents a *prima facie* case, the burden shifts to Defendant to present a "legitimate, non-discriminatory reason" for termination. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citation omitted). If Defendant carries that burden, Plaintiff then must establish that the reason is a pretext for discrimination. *Id.*

Defendant concedes for the purpose of this Motion that Plaintiff is a disabled person within the meaning of the ADA and is qualified to perform the essential functions of his job. However, Defendant contests that Plaintiff was terminated as a "result of" discrimination. As with claims made pursuant to the ADEA, a plaintiff bringing a claim pursuant to the ADA must show that his or her disability was a "determinative factor" in the defendant's decision to terminate them. *Decker v. Alliant Technologies*, LLC, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000)).

As an initial matter, "to establish discrimination because of a disability, an employer must know of the disability." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (citation omitted). The parties dispute whether, or at what point, Plaintiff's supervisors became aware of Plaintiff's mental illness. This is not a genuine dispute. It is clear that Defendant was aware of Plaintiff's disorder from the time of his diagnosis. Not only was the diagnosis included on a written Certification of a Physician in 2006, but Plaintiff's supervisors demonstrated an

actual awareness of Plaintiff's disorder and the effects it could be having on his job performance. One of Plaintiff's supervisors admitted that she had been aware of the disorder for years and that she thought it could be affecting Plaintiff's job performance. Although Cullen denied knowledge of the disorder, this is belied by his acknowledgement in 2010 that Plaintiff had displayed a pattern of issues that became so extreme that Cullen was scared for Plaintiff's safety. Cullen's testimony stating otherwise is questionable for other reasons as well. Plaintiff's other supervisor directly contradicted Cullen when she stated that she discussed with Cullen her concerns about Plaintiff's mental health. Moreover, Cullen's testimony indicates that he recalls very little about Plaintiff's employment overall, despite being Plaintiff's direct supervisor for nearly six years and despite Plaintiff's extensive disciplinary history. (*See generally*, Cullen Dep. (stating nearly 100 times during a 1.5-hour deposition that he could not recall when answering the deposer's questions).) There is no genuine dispute that Defendant was aware, and had been aware for many years, of Plaintiff's diagnosis and its effects on his job performance.

Next, Plaintiff argues that his disorder, and changes in medications to deal with the disorder, caused many of the incidents resulting in discipline or poor performance reviews. He argues that this disciplinary history shows Defendant's frustrations with his bipolar disorder over the years so that, by the time of the incident on October 9th, Defendant would have fired Plaintiff anyway. Plaintiff argues that the incident provided a convenient façade for Defendant's decision to terminate Plaintiff on the basis of his disability. However, Plaintiff admits his culpability in the October 9th incident. Therefore, there is no dispute as to the fact that discipline was warranted. Rather, it appears that Plaintiff challenges only the severity of the discipline. Defendant maintains that its reason for terminating Plaintiff was his misconduct over the years and the ultimate patient safety incident that occurred on October 9th.

21

Even viewing the facts in the light most favorable to Plaintiff, the evidence does not support an inference of causation between Plaintiff's disability and his termination. An employer is permitted to discharge an employee for misconduct, "even if that misconduct is related to [the employee's] disability." *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 149 (3d Cir. 2018) (citing 42 U.S.C. § 12113(a), (b); 29 U.S.C. § 794(d)); *Walton v. Spherion Staffing LLC*, 152 F. Supp. 3d 403, 407 (E.D. Pa. 2015) (stating that "a disabled person can be lawfully terminated for disability related misconduct" and collecting cases in support of that proposition). Plaintiff's disciplinary history, culminating in the incident on October 9th, reflects a consistent pattern of misconduct that could certainly have been caused by his bipolar disorder and changes of medication, as Plaintiff argues. But Plaintiff does not dispute that misconduct did in fact occur prior to the October 9th incident, and he does not argue that he was singled out for discipline or that others were treated more favorably for that same conduct prior to October 9th.[7] *Cf. Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 651 (W.D. Pa. 2018) (finding inference of discrimination when plaintiff was terminated based on history of discipline because plaintiff had been singled out for such discipline). Despite this history of misconduct and poor performance, the record shows that, rather than being frustrated with Plaintiff's disability and wanting to terminate him because of it, Defendant made repeated attempts to accommodate

---

[7] Plaintiff argues that he felt many of the incidents recorded in his disciplinary history were minor and did not result in anything more than a Discussion Sheet memorializing his coworkers' and supervisors' feelings about an incident. (*See, e.g.*, Pl.'s Dep. 56 ("There's a lot of things that are on that sheet [summarizing Plaintiff's disciplinary history] that I thought that were very minor that weren't really reportable as incidents.").) However, as stated above, "it is not for this Court to 'sit as a super-personnel department that reexamines an entity's business decisions.'" *Carfagno v. SCP Distrib., LLC*, No. 14-4856, 2016 WL 521196, at *5 (E.D. Pa. Feb. 10, 2016) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)). Plaintiff's supervisors felt it was necessary to make these notations in Plaintiff's file, and we accept them as part of his disciplinary history.

Plaintiff and to help him control his misconduct and improve his performance. Over a period of more than ten years, Plaintiff's supervisors: (1) approved multiple instances of leave time for Plaintiff to, for example, "get the necessary help he needs" (Letter to Dr. O'Connor); (2) changed his schedule so that he did not deal directly with patient safety; (3) counseled him on dealing with coworkers more diplomatically; (4) issued a "Performance Improvement Plan" to help him provide a better standard of care; and (5) ultimately allowed him to work only on minor matters. Nevertheless, Plaintiff's poor conduct ultimately caused a patient safety emergency that could have been catastrophic. The ADA does not insulate plaintiffs from such misbehavior and poor performance. *See Worthington*, 2017 U.S. Dist. LEXIS 127710, at *10.[8]

Plaintiff attempts to cast Defendant's statements about his poor performance as "negative commentary . . . relative to Plaintiff's bipolar disorder." (Pl.'s Resp. 19.) Although some of this commentary, such as "nervous and anxious," may overlap with the symptoms of the disorder, the commentary is accompanied by very real concerns that these symptoms could—and did— interfere with Plaintiff's ability to perform his job, despite the many accommodations Defendant made over time. (*See, e.g.*, Letter to Dr. O'Connor (stating examples of Plaintiff's "nervous and

---

[8] As an alternative to his above arguments, Plaintiff submits, in a footnote, that "he could proceed on a mixed motive theory under the ADA." (Pl.'s Resp 19 n. 12.) "[I]n order to prevail under a 'mixed-motives' theory, a plaintiff need only show that the unlawful motive was a 'substantial motivating factor' in the adverse employment action." *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 187-88 (3d Cir. 2003) (quoting *Watson*, 207 F.3d at 215) (alterations omitted). We note that Plaintiff has not elaborated on his mixed-motive theory or explained what evidence would support it, and Defendant has not responded to Plaintiff's brief assertion of the theory. However, as discussed above, the record before us does not contain any evidence of discriminatory intent. In fact, the record contains quite the opposite—extensive efforts on the part of Defendant to accommodate Plaintiff's disability. Therefore, the evidence does not support a mixed-motive theory. *See Williams v. Pennsylvania Hosp. of Univ. of Pennsylvania Health Sys.*, No. 17-2413, 2018 U.S. Dist. LEXIS 159469, at *31 n. 6 (E.D. Pa. Sept. 18, 2018) (noting that mixed-motive theory in ADA case fails on summary judgment because "[t]he record is devoid of affirmative evidence that Defendants acted with a discriminatory intent").

anxious" behavior, such as causing distress in a patient's family, calling one nurse "Little Hitler," telling another nurse to "shut up," and assessing a patient improperly).) Plaintiff has not pointed to any evidence of "negative commentary" related to his disorder that was not also related to his inability to properly perform his job. Therefore, these comments do not support an inference of discrimination.

Accordingly, we will grant Defendant's motion for summary judgment on his ADA and PHRA claims.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted. An appropriate Order follows.

**BY THE COURT:**

R. BARCLAY SURRICK, J.

24